UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MALIK FUQUA,

          Petitioner,

v.

UNITED STATES OF AMERICA,

          Respondent.
_____/

Civil Case Number 20-11163
Criminal Case Number 16-20436
Honorable David M. Lawson

## OPINION AND ORDER DENYING MOTION TO VACATE SENTENCE

After being charged in nine counts of a 13-count superseding indictment alleging health care fraud, illegal medication distribution, and money laundering, petitioner Malik Fuqua pleaded guilty to conspiracy to distribute controlled substances. Under the plea agreement, all of the other charges were dismissed. Fuqua was sentenced to 132 months in prison, to be followed by a term of supervised release. He did not appeal his conviction or sentence.

Fuqua now moves to set aside his sentence and conviction, contending that he received ineffective assistance of counsel for three specific reasons. He also contends that his speedy trial rights were violated. The record conclusively demonstrates, however, that Fuqua's lawyers' performance accorded with professional norms and his complaints about them have no basis in fact. And his speedy trial claims, which also are contradicted by the record, are waived by his valid guilty plea. The motion will be denied.

I.

Fuqua was charged along with his co-defendant (and mother), Shirley Douglas, in nine counts of a first superseding indictment. The charges included healthcare fraud, drug distribution, maintaining a drug-involved premises, money laundering, and related conspiracy counts. The government alleged that from sometime in 2009 through 2016, the defendants owned and managed

several entities that operated physical therapy and pain management clinics at various locations in Oak Park and Southfield, Michigan.  Douglas owned and operated Abyssinia Love Knot Physical Therapy, LLC ("Abyssinia"), Abyssinia Group, Inc., and 1st Priority Guardianship.  The clinics run by those entities employed doctors who purportedly treated patients, and the entities submitted claims to Medicare and to Blue Cross Blue Shield of Michigan for physician office visits and physical therapy sessions.  Douglas also owned and operated Abyssinia Church of God, Inc., which was a Michigan non-profit corporation chartered for the purposes of, among other things, "preaching the gospel," and "helping the marginalized."  Fuqua owned and operated 1st Priority Physical Therapy, LLC ("1st Priority"), which ran similar clinics at several other locations.  He also submitted claims to Medicare and Blue Cross.

The government alleged that Douglas and Fuqua recruited patients and hired persons to locate patients who would supply their personal information to be used in making false claims for services that were medically unnecessary or never performed.  The patients and hawkers who found them allegedly were paid kickbacks out of the proceeds from those false claims.  The defendants also hired doctors who would write prescriptions for pain medications that were medically unnecessary, and the drugs thusly obtained were passed on to the hawkers to sell for profit.  In some cases, the defendants purportedly submitted claims for services provided to patients after those persons had died.  They also concocted false medical documents such as MRI scan reports, toxicology reports, and records of prescriptions for submission to state monitoring agencies.

The case began when the original indictment was returned and filed on June 16, 2016.  It charged Fuqua, Douglas, and Frank Middleton with health care fraud and drug crimes in six counts.

On January 30, 2018, the government filed a superseding indictment charging Fuqua and Douglas in 13 counts, tacking on seven additional drug and money laundering charges.

Frank Middleton pleaded guilty to the fraud crimes on January 17, 2018, but he died on March 31, 2018 before he was sentenced.

On June 27, 2016, in the first post-indictment scheduling order issued by the Court, the jury trial was set to begin on August 16, 2016. The trial and pretrial deadlines subsequently were adjourned nine times upon the defendants' joint requests between July 15, 2016 and July 17, 2019.

The defendants filed numerous procedural and substantive motions throughout the pretrial proceedings, both on their own initiative and through counsel. On July 15, 2016, the defendants jointly filed a motion to expand the case budget and declare the case eligible for complex litigation budgeting, which was granted on August 24, 2016. The defendants also jointly filed motions to extend the time for filing pretrial motions, which were granted on December 14, 2016 and March 7, 2017. On May 7, 2017 and July 1, 2017, Fuqua filed two more motions to increase the case budget, which were granted on October 3, 2017.

On February 5, 2018, Fuqua filed *pro se* motions to proceed with standby counsel and to sever and dismiss charges. The motion to dismiss and sever was denied on February 8, 2018, and the motion to proceed with standby counsel was granted on February 14, 2018. On the same latter date, Douglas filed through counsel a motion to dismiss the superseding indictment and three motions to suppress evidence. On March 2, 2018, Fuqua filed five more *pro se* motions, including three separate motions to dismiss the indictment on various grounds of "vagueness and misnomer identity," multiplicitous and duplicitous charges, failure adequately to allege the elements of any federal criminal offense, concealment of exculpatory evidence, and the government's alleged failure to abide by scheduling deadlines established by the Court. Fuqua also filed on the same

date a motion for a bill of particulars. On August 6, 2018, Douglas also filed a motion to exclude testimony by the government's expert witnesses. Fuqua subsequently filed "notices of joinder" in all of his co-defendant's various motions.

The Court held a hearing on the pretrial motions on August 7, 2018, and most were denied on the record during the hearing. However, the Court granted one of the motions to suppress information obtained via an order under the authority of the Stored Communications Act, 18 U.S.C. 2703(d), and it took under advisement two other motions to suppress and Fuqua's motion to dismiss charges on vagueness grounds. The Court denied those remaining motions in an opinion issued on March 22, 2019.

Following the multiple defense-requested adjournments, the jury trial eventually was set to begin on November 19, 2019. On November 13, 2019, Fuqua pleaded guilty to one count of conspiring to distribute controlled substances and was sentenced on March 16, 2020.

II.

Fuqua argues that his trial lawyers were ineffective because: (1) a preliminary hearing was not requested after he was indicted; (2) no motions were filed on his behalf by his several attorneys; and (3) he was coached to plead guilty. He also contends that his speedy trial rights were violated because (1) there was nearly a one-year gap between the execution of a premises search warrant and his arrest; (2) law enforcement was aware of the illegal conduct occurring at the pain clinics operated by Fuqua and Douglas for several years before they were indicted; (3) neither Fuqua nor his mother fled during the pendency of their criminal cases; and (4) nevertheless, the government failed to advance the case diligently toward trial.

A federal prisoner challenging his sentence under section 2255 must show that the sentence "was imposed in violation of the Constitution or laws of the United States," the sentencing court

lacked jurisdiction, the sentence exceeds the maximum penalty allowed by law, or it "is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). And he "must allege either: '(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid.'" *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (quoting *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003)).

A claim that could have been raised on direct appeal generally is not reviewable in a section 2255 motion. *Bousley v. United States*, 523 U.S. 614, 621 (1998) (holding that "even the voluntariness and intelligence of a guilty plea can be attacked on collateral review only if first challenged on direct review"); *Regalado v. United States*, 334 F.3d 520, 528 (6th Cir. 2003) (reaffirming that "[s]ection 2255 is not a substitute for a direct appeal, and thus a defendant cannot use it to circumvent the direct appeal process"). Moreover, when a defendant fails to raise an issue at trial or on direct appeal, that issue is generally forfeited. *See Huff v. United States*, 734 F.3d 600, 605-06 (6th Cir. 2013).

However, a claim that otherwise would be forfeited may be raised through a collateral attack under section 2255 if a defendant "can demonstrate cause and prejudice to excuse his default." *Id.* at 606. "Ineffective assistance of counsel can constitute cause for a procedural default." *Ibid.* Furthermore, a claim that "cannot otherwise be reviewed for the first time on a § 2255 motion can be reviewed as part of a successful claim that counsel provided ineffective assistance." *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001). And a claim of ineffective assistance of counsel itself is properly raised in a section 2255 motion. *United States v. Graham*, 484 F.3d 413, 421-22 (6th Cir. 2007) (quoting *United States v. Aguwa*, 123 F.3d 418, 423 (6th Cir. 1997)).

A.

Any freestanding claims of undue delay or other procedural defects in the pretrial proceedings are foreclosed by Fuqua's guilty plea, because review of a conviction upon a guilty plea is limited to whether the plea was knowing, intelligent, and voluntary. *See Tollett v. Henderson*, 411 U.S. 258, 261-67 (1973) (holding that a valid guilty plea waives any antecedent non-jurisdictional defects in a conviction); *United States v. Pickett*, 941 F.2d 411, 417 (6th Cir. 1991) (noting that a conviction by "guilty plea bars any subsequent non-jurisdictional attack on the conviction, even if the attack is a constitutional one"). Moreover, all of Fuqua's claims of pretrial delays and other procedural errors that could have been raised on direct appeal are unreviewable in a section 2255 motion. *Bousley*, 523 U.S. at 621. Therefore, collateral review here is limited to the question whether, as Fuqua contends, his trial lawyers were ineffective by failing to raise certain procedural objections or to file additional pretrial motions.

B.

Fuqua argues that his trial attorneys were ineffective by failing to raise certain procedural challenges. To succeed on an ineffective assistance of counsel claim, the petitioner "must show both deficient performance and prejudice." *Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009). An attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). One way of establishing deficient performance is to show that defense counsel missed a meritorious argument under the controlling law. However, the failure to file a meritless motion or raise a groundless objection does not constitute deficient performance. *Jalowiec*, 657 F.3d at 321-22 (stating that an "attorney is not required to raise a non-meritorious claim" (citing *Wilson v. Mitchell*, 498 F.3d 491, 514-15 (6th Cir. 2007))); *see also Knowles*, 556 U.S. at 123 (noting that the "[Supreme] Court has never

required defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic chance for success" to avoid a finding of deficient performance under *Strickland*).

An attorney's deficient performance is prejudicial if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. The petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

In a federal habeas proceeding, when the Court weighs a claim of ineffective assistance, "[a]n evidentiary hearing is required unless the record conclusively shows that the petitioner is entitled to no relief" on his claim. *Martin v. United States*, 889 F.3d 827, 832 (6th Cir. 2018) (quotations omitted). "Where there is a factual dispute, the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims." *Ibid.* However, "[a] petitioner's mere assertion of his innocence, without more, does not entitle him to an evidentiary hearing." *Ibid.*

Where the record presents "considerable doubt" about the interactions of a petitioner and his attorney, the Court should conduct an evidentiary hearing to bring clarity to the proceedings. *See Smith v. United States*, 348 F.3d 545, 553 (6th Cir. 2003). But, where, as here, the existing record demonstrates that claims of ineffective assistance are unsupported, and that the petitioner has not met the *Strickland* standard, no hearing is required. *Goward v. United States*, 569 F. App'x 408, 412 (6th Cir. 2014).

First, Fuqua says that his trial counsel was ineffective by failing to request a preliminary examination. However, the Sixth Circuit "has repeatedly held that if 'a grand jury returns a true bill prior to the time a preliminary hearing is held, the whole purpose and justification of the preliminary hearing has been satisfied,'" and "[a] defendant has no right to have a preliminary

hearing if a grand jury indictment is returned." *United States v. Woods*, 544 F.2d 242, 249 (6th Cir. 1976) (quoting *United States v. Mulligan*, 520 F.2d 1327, 1329 (6th Cir. 1975)).  This case was commenced with an indictment, not a complaint.  Fuqua's trial counsel was not ineffective by not requesting a preliminary examination, because the petitioner had no right to such a proceeding after he was indicted.

Second, Fuqua argues that his trial counsel was ineffective because "no motions were filed" by any of his lawyers.  However, as the government points out, the record shows that numerous motions were filed by Fuqua's trial counsel, and Fuqua joined in other motions that were filed by his co-defendant's counsel.  There were 22 pretrial motions filed in all.  Fuqua filed motions and joined in motions filed by his co-defendant challenging almost every aspect of the proceedings including six motions to dismiss the charges on various grounds and three motions to suppress evidence.  One of the motions to suppress was granted by the Court, and the other motions all were denied on the merits.  Fuqua can demonstrate neither deficient performance nor prejudice as a result of the failure to file additional, unspecified motions, because he has made no effort to identify what legal or factual issues should have been raised but were not.

Third, Fuqua contends that his trial counsel was ineffective by "coaching" him to plead guilty.  However, the record of the plea hearing plainly demonstrates that Fuqua admitted on the record that he understood the elements of the crimes and how the government's evidence would prove them at trial, that he understood and wanted to waive all of his trial rights, that he was satisfied with the advice and services of his trial counsel, and that he wanted to plead guilty because he was guilty.

First, the Court explained all of Fuqua's trial rights, and he indicated that he understood and wanted to waive them.  Plea Hrg. Tr., ECF No. 251, PageID.2097-98.  Second, counsel for the

government recited all of the substantive provisions of the Rule 11 plea agreement on the record, and Fuqua stated that he had discussed the terms of the agreement with his lawyer and understood all of them. *Id.* at PageID.2089-95. Third, the Court engaged in the following colloquy in which Fuqua was asked whether his trial counsel had discussed the elements of the charged crimes and the evidence against him, and Fuqua plainly stated that he had discussed the evidence, understood the charges, and was satisfied with the advice and services rendered by his counsel:

> THE COURT: All right. Did your lawyers review the evidence with you?
>
> THE DEFENDANT: Yes. They went over the evidence with me.
>
> COURT: All right. Did they explain how the evidence would satisfy the Government's proof obligations?
>
> THE DEFENDANT: Yes, they explained it.
>
> THE COURT: Have you considered and obtained advice on the relative advantages and disadvantages of pleading guilty versus going to trial?
>
> THE DEFENDANT: Yes, your Honor.
>
> THE COURT: Have you decided it is in your own best interest to plead guilty and give up your right to trial?
>
> THE DEFENDANT: Yes, your Honor.
>
> THE COURT: Are you satisfied with the advice and the services that your lawyers have rendered on your behalf through today?
>
> THE DEFENDANT: Yes.

*Id.* at PageID.2087-88; *see also id.* at PageID.2086-87 ("THE DEFENDANT: Have we went over each count and did they tell me how what I did relates to that, related to each count? Are you asking me — THE COURT: Well, that wasn't my question, but that's a good question. Did they do that? . . . . THE DEFENDANT: They — we went over it pretty extensively over the years."). The Court also asked Fuqua specifically if he had been pressured or threatened to plead guilty, or

if he had been promised or offered anything not covered by the terms of the Rule 11 plea agreement in exchange for pleading guilty:

> THE COURT: All right. Now, have you had a chance to discuss the terms of this plea agreement with both of your attorneys to your satisfaction?
>
> THE DEFENDANT: Yes, I have.
>
> THE COURT: All right. Has anyone made any other or different promise or assurance to you of any kind in an effort to persuade you to plead guilty?
>
> THE DEFENDANT: They absolutely haven't told me anything. No.
>
> THE COURT: Has anyone?
>
> THE DEFENDANT: No.
>
> THE COURT: That is, have you been promised by the Court, or by the attorney for the Government, or your attorneys that you would be put on probation or given any other specific sentence in exchange for your guilty plea?
>
> THE DEFENDANT: They haven't told me anything.
>
> THE COURT: Nobody has?
>
> THE DEFENDANT: No way. No.
>
> THE COURT: All right. And has anyone told you that you would be treated more leniently or get a shorter sentence if you gave up your right to trial and pleaded guilty instead?
>
> THE DEFENDANT: No.
>
> THE COURT: All right. Has anyone tried to force you to plead guilty by any threats or pressure or mistreatment of any kind?
>
> THE DEFENDANT: Nobody has threatened me.
>
> THE COURT: Did you understand my question?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Could you answer it?
>
> THE DEFENDANT: Yes, nobody —
>
> THE COURT: Has anyone — let me ask it again. Has anyone tried to force you to plead guilty by any threats, mistreatment, or any pressure?

> THE DEFENDANT: No.
>
> THE COURT: All right. Are you pleading guilty freely and voluntarily?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Is that because it's your own choice to plead guilty?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And it is, in fact — and is it also because, in fact, you are guilty?
>
> THE DEFENDANT: Yes.

*Id.* at PageID.2095-97.

In short, the plea record demonstrates that Fuqua understood his rights and wished to waive them, understood the charges and wished to plead guilty because he was in fact guilty, and was satisfied with the legal advice he had received. Fuqua has put forth no evidence credibly calling into question the veracity of his statements on the record at the plea hearing. To the contrary, his "[s]olemn declarations in open court carry a strong presumption of verity" and "constitute a formidable barrier in any subsequent collateral proceedings." *Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977). That unimpeached record belies any claim that Fuqua was improperly "coached" to plead guilty for any reasons other than those which he stated on the record.

Finally, Fuqua argues that his Sixth Amendment speedy trial right was violated by the three-year delay between indictment and conviction, and that his trial counsel was ineffective by failing to move to dismiss the case on the ground of undue delay. This claim is without merit because Fuqua has not demonstrated that there was any viable speedy trial challenge that should have been raised by counsel but was not. "In *Barker v. Wingo*, the Supreme Court established a four-factor test for determining whether a defendant's constitutional right to a speedy trial has been violated: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant." *Ibid.* (quoting 407 U.S. 514, 530 (1972)). On

balance, the *Barker* factors plainly do not favor a finding of a Sixth Amendment violation on the undisputed record.

It is true that the delay between lodging of the first indictment and the final settled trial date was more than three years. "Delays of over a year 'generally' satisfy the lengthiness requirement, thereby calling for the full *Barker* analysis." *United States v. Thornton*, No. 19-5953, 2020 WL 4464525, at *4 (6th Cir. Aug. 4, 2020) (quoting *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992)). But the reasons for the delay so far as the record demonstrates all are attributable to the defense, not the government. "'In assessing the second factor, the reason for the delay, the court considers who is most at fault — the government or the defendant.'" *Thornton*, 2020 WL 446425, at *4 (quoting *Brown v. Romanowski*, 845 F.3d 703, 714 (6th Cir. 2017)). In this case, as demonstrated by the procedural history recited above, "the overwhelming majority of delays were due to [numerous] pre-trial motions filed by [the defendants]," as well as the defendants' serial demands to delay the advancement of the trial schedule and to obtain additional funding for development of the case; moreover, none of the "delays were solely attributable to the United States," and "[t]his factor thus weighs in the government's favor." *Ibid.*

"The third *Barker* factor, the defendant's assertion of his right to a speedy trial, 'is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right.'" *Thornton*, 2020 WL 4464525, at *4 (quoting *Barker*, 407 U.S. at 531-32). "Although a defendant does not waive the right to a speedy trial by failing to assert it, the degree to which the defendant has asserted the right is one of the factors to be considered in the balance." *United States v. Brown*, 169 F.3d 344, 350 (6th Cir. 1999) (citing *Barker*, 407 U.S. at 531-32); *see also Thornton*, 2020 WL 4464525, at *4 ("Thornton first referenced his right to a speedy trial on October 19, 2018, twenty-one months after his indictment. In the interim, he filed a host of motions requiring delay

of his trial. Thornton's belated assertion 'cast[s] doubt on the sincerity of the demand and weighs in favor of the government.'" (quoting *United States v. Sutton*, 862 F.3d 547, 561 (6th Cir. 2017) (embedded quotations and citations omitted))). In this case, Fuqua *never* asserted his speedy trial right before raising it in the present motion to vacate his sentence, and this factor therefore weighs against a finding of undue delay.

Fourth, Fuqua has not demonstrated that his defense was prejudiced by any undue delay of the trial proceedings. "The last *Barker* factor is concerned with the prejudice suffered by the defendant," and to carry his burden on that point the "defendant must show that 'substantial prejudice' has resulted from the delay." *Thornton*, 2020 WL 4464525, at *4 (quoting *United States v. Schreane*, 331 F.3d 548, 557 (6th Cir. 2003); *United States v. White*, 985 F.2d 271, 276 (6th Cir. 1993)). Prejudice must be assessed by the Court in light of the purposes of the speedy trial guarantee, which are "(1) to prevent oppressive pretrial incarceration, (2) to minimize anxiety and concern due to unresolved criminal charges, and (3) to minimize damage to the defense." *Sutton*, 862 F.3d at 561-62 (6th Cir. 2017). "Damage to the defense is the 'most serious'" of these considerations, *Thornton*, 2020 WL 4464525, at *4 (quoting *Barker*, 407 U.S. at 532), but to make the required showing "the defendant must demonstrate 'how his defense was prejudiced with specificity,'" *ibid.* (quoting *United States v. Young*, 657 F.3d 408, 418 (6th Cir. 2011)). "When the defendant fails to 'articulate the harm caused by delay, the reason for the delay (factor 2) will be used to determine whether the defendant was presumptively prejudiced.'" *Ibid.* (quoting *United States v. Williams*, 753 F.3d 626, 634 (6th Cir. 2014)).

Fuqua asserts that one of his co-defendants and several of the physicians employed by the entities in question died after he was indicted and therefore could not have testified at trial. However, he has not produced any proof of what any of those witnesses might have testified about,

or how their testimony would have aided his defense. "Without producing or otherwise detailing the [potential] witnesses' testimony, the defendant's claim essentially relies on 'speculation about what unidentified persons might have said,' and such a showing fails to carry [the defendant's] burden to show prejudice." *Veal v. Cooper*, 936 F. Supp. 511, 514-15 (N.D. Ill. 1996) (citations omitted); *see also Dell v. Straub*, 194 F. Supp. 2d 629, 650 (E.D. Mich. 2002) (concluding that defense counsel's failure to present witnesses did not amount to ineffective assistance of counsel because the defendant failed to identify the witnesses, indicate their availability, or specify the content of their testimony).

The *Barker* factors plainly did not favor a finding of undue delay, and the petitioner's trial counsel therefore was not ineffective by failing to raise a speedy trial challenge.

C.

In a supplemental filing, Fuqua argues that his conviction for conspiring to distribute controlled substances is defective under the holding of *Ruan v. United States*, --- U.S. ---, 142 S. Ct. 2370 (2022). But that case does not help him.

In *Ruan*, the Supreme Court confronted a narrow question about the elements the government must prove to convict a licensed physician for "unauthorized" distribution of controlled substances. *See id.* at 2375 ("The question we face concerns § 841's exception from the general prohibition on dispensing controlled substances contained in the phrase '[e]xcept as authorized.' In particular, the question concerns the defendant's state of mind. To prove that a doctor's dispensation of drugs via prescription falls within the statute's prohibition and outside the authorization exception, is it sufficient for the Government to prove that a prescription was in fact not authorized, or must the Government prove that the doctor knew or intended that the prescription was unauthorized?"). The Court held that "once a defendant meets the burden of

producing evidence that his or her conduct was 'authorized,' the Government must prove beyond a reasonable doubt that the defendant knowingly or intentionally acted in an unauthorized manner." *Id.* at 2376.

The holding of *Ruan* is inapplicable because it is undisputed that Fuqua was not at any time a licensed physician, and there never has been any suggestion that his scheme to distribute controlled substances was in any way "authorized" by any federal law or regulation. *See Williams v. United States*, No. 20-55, 2022 WL 16936253, at *3 (E.D.N.C. Nov. 14, 2022) (holding that *Ruan* "did not introduce a new scienter standard for all prosecutions under 21 U.S.C. § 841. "Instead, the change in scienter requirement applies only to the state of mind that the Government must prove to convict a doctor of violating 21 U.S.C. § 841") (citations and quotations omitted) (denying motion to amend 2255 petition to add a claim under *Ruan*).

### III.

The petitioner has failed to show that there was any constitutional defect in the proceedings or that his counsel was ineffective.

Accordingly, it is **ORDERED** that the petitioner's motion and amended and supplemental motions to vacate his convictions and sentences (ECF No. 291, 346, 355, 379, 402) are **DENIED**.

s/David M. Lawson  
DAVID M. LAWSON  
United States District Judge

Date:  July 10, 2023